UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| TONY J. JACKSON, | CASE NO. 3:18-cv-05657-BHS |
| Petitioner, | ORDER |
| v. | |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

This matter comes before the Court on Petitioner Tony J. Jackson's Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255, Dkt. 1, following an evidentiary hearing on the motion, Dkt. 89, and the parties' post-hearing briefing, Dkts. 93–95. Prior to entering his plea, the Government assured Jackson that his co-conspirator would not receive a better plea deal. Later, Jackson's co-conspirator was offered and signed a more favorable plea deal. Jackson asks the Court to vacate his conviction based on ineffective assistance of counsel, because his attorney did not inform him the Government's assurance was not binding.

ORDER - 1

# I. BACKGROUND

## A. Criminal Proceedings

On November 20, 2015, Jackson pled guilty to Conspiracy to Engage in Sex Trafficking by Force, Fraud and Coercion. *United States v. Jackson*, No. 14-cr-5242 RJB, Dkt. 136 (W.D. Wash. Nov. 20, 2015). The November 20 hearing was initially set for the Court to consider Jackson's motion to suppress. *Id.*, Dkts. 122, 127. Jackson and the Government reached a plea deal before the hearing commenced and the change of plea was heard in place of the suppression motion. Dkt. 72 at 2.

The parties agree that, just before the change of plea hearing commenced, Jackson, Jackson's attorney (Charles Johnston), Assistant United States Attorney Ye-Ting Woo, and Assistant United States Attorney Bruce Miyake had a conversation about Jackson's plea agreements in the courtroom before the presiding judge, Judge Bryan, entered. Jackson had expressed to Johnston that he was concerned that, if he pled guilty, his co-conspirator, James Young, may receive a better plea deal than Jackson. Jackson asserts that Johnston then told the AUSAs that Jackson "was worried that if he took the deal, the co-defendant (Mr. Young) would get a better deal later." Dkt. 70-2, ¶ 6. According to Jackson, Woo then reassured him that Young "would not get a better offer" and that he would "get the same amount of time as [Jackson] if not more." *Id.* ¶ 7 (internal quotation marks omitted). Jackson asserts that he would not have pled guilty absent that "promise" from the Government. *Id.* ¶ 3.

While the Government agrees that this conversation took place, it disagrees about what exactly it represented to Jackson. The Government asserts that Johnston asked

whether Young would receive a more favorable plea offer than Jackson. Dkt. 72 at 3. It asserts that Miyake responded that the Government "made a similar plea offer to Young that did not involve an offer of less than 10 years of imprisonment and that Young had declined to accept the government's plea offer." *Id.* (internal quotation marks omitted).

Johnston's recollection of the conversation is similar to Jackson's.[1] In his affidavit, Johnston asserts that Jackson expressed reluctance to plead guilty if it was possible Young would receive a better offer from the Government later. Dkt. 70-3 at 2; *see also* Dkt. 70-4, ¶ 5. He states that Miyake then "verbally promised Mr. Jackson that, that was not going to happen and that Mr. Young would not get a better offer but the same offer of time if not more." Dkt. 70-3 at 2; *see also* Dkt. 70-4, ¶ 8. Johnston further asserts that "it was for [Jackson's] benefit that [Johnston] had the conversation with Mr. Miyake in front of Mr. Jackson so that his concerns would be addressed and guilty plea would go through." Dkt. 70-4, ¶ 9. Johnston also states that he did not think the Government would have agreed to put the promise in writing and that, when he later confronted Miyake about Young's better plea agreement, Miyake told him that "he knew he promised [Johnston] that the two co-defendants would get the same deal but that things changed and the case against Mr. Young had fallen apart." *Id.* ¶¶ 10–11.

The parties agree that the Government's promise was not included in the written plea agreements and that Jackson represented to Judge Bryan during the hearing that the

---

[1] Johnston does state, however, that he does not remember AUSA Ye-Ting Woo being present. Dkt. 70-4, ¶¶ 4, 7. The record reflects that Woo was present at the hearing, *Jackson*, No. 14-cr-5242 RJB, Dkt. 136, and Johnston agreed at the January 2023 hearing that, based on those records, Woo must have been present.

ORDER - 3

written plea agreements encompassed the entire agreement between the parties. Jackson ultimately pled guilty to one count of Conspiracy to Engage in Sex Trafficking by Force, Fraud, and Coercion, agreeing to a sentencing recommendation between 120 and 180 months. Judge Bryan sentenced Jackson to 140 months[2] imprisonment followed by a five-year term of supervised release.

Young and Jackson were charged with largely the same crimes.[3] In June 2016, Young pled guilty, agreeing to a custodial sentence of 120 to 156 months. Dkt. 70 at 5. Young's attorneys subsequently discovered that one of the police agencies who had investigated the case had suppressed impeachment evidence regarding a critical witness.[4] *Id.* Judge Bryan therefore allowed Young to withdraw his guilty plea and, in August 2017, Young pled guilty to a lesser charge, Interstate Transportation for the Purpose of Prostitution, and agreed to a 90-month custodial sentence. *Id.* Judge Bryan sentenced Young to 90 months imprisonment followed by a three-year term of supervised release on February 15, 2018. *Id.*

---

[2] The original judgment stated that the Court imposed a sentence of 144 months, *Jackson*, No. 14-5242, Dkt. 177, but the judgment was later corrected to reflect a 140-month sentence, *id.*, Dkt. 445.

[3] Young was charged with one count of Conspiracy to Engage in Sex Trafficking by Force, Fraud and Coercion; three counts of Sex Trafficking Through Force, Fraud, and Coercion; one count of Conspiracy to Transport Females for Prostitution; and five counts of Interstate Transportation for the Purpose of Prostitution. *Jackson*, No. 14-5242, Dkt. 172.

Jackson was charged with one count of Conspiracy to Engage in Sex Trafficking by Force, Fraud, and Coercion; three counts of Sex Trafficking through Force, Fraud, and Coercion; one count of Conspiracy to Transport Females for Prostitution; and two counts of Interstate Transportation for the Purposes of Prostitution. *Id.*, Dkt. 29.

[4] It is unclear whether Jackson would also have been able to suppress similar evidence had he not pled guilty in 2015.

B.  **Procedural History in this Case**

On August 13, 2018, Jackson filed the instant motion under 28 U.S.C. § 2255,[5] Dkt. 1, and a memorandum of law in support of the motion, Dkt. 2. Jackson argued that his guilty plea was conditioned on a promise made by the prosecutor that the Government would not offer less time to Young, and that the prosecutor breached the agreement when he offered Young a better deal. *Id.* Jackson requested to be resentenced, tendered the performance of the Government's promise that he would get the same amount of time in custody as Young, or granted any other remedy the Court deemed appropriate. *Id.* The Government responded and moved to dismiss the petition, Dkt. 11, and the Court dismissed the petition for lack of jurisdiction after deeming it a second or successive petition, Dkt. 14.

On February 7, 2019, Jackson filed a motion for reconsideration arguing that the motion was "second-in-time" instead of second or successive because the factual predicate of the claim, his co-defendant's plea bargain, did not occur until after his first motion was denied. Dkt. 17. The Court granted Jackson's motion and permitted the parties to file supplemental briefing. Dkt. 24.

---

[5] Jackson previously moved for habeas relief in January 2017 on the ground that Johnston's performance was deficient because he told Jackson that his offense level was 34 when the actual base offense level was 14. *Jackson v. United States*, No. 17-cv-5064 RJB (W.D. Wash. Jan. 27, 2017), Dkt. 1. Judge Bryan denied Jackson's petition because Johnston could not have known Jackson's base offense level was 14—that was determined in a Ninth Circuit case that was decided after Jackson pled guilty. *See id.*, Dkt. 15. Jackson filed that petition before Young withdrew his initial plea.

ORDER - 5

Following the parties' supplemental briefing, Jackson filed various motions and letters, one of which was entitled "Evidence in Support of Petitioner's Motion Under § 2255." Dkt. 38. In that filing, Jackson cited to case law involving ineffective assistance of counsel claims, arguing that he had "been precluded from a claim of ineffective assistance." *Id.* He asked the Court to consider his trial counsel's "deficient perform[a]nce." *Id.* at 4. It is not abundantly clear from the face of his "motion" that Jackson intended to advance an ineffective assistance of counsel claim. The filing generally states that his plea was not "knowing and intelligent" because he misunderstood the representations made by the Government regarding potential plea deals for Young. *See generally id.*

The Court denied Jackson's motion to vacate his sentence and concluded that Jackson did not assert a claim for ineffective assistance of counsel. Dkt. 39. It instead considered the filing as "another document in support of his motion." *Id.* at 4. Jackson sought reconsideration, Dkt. 42, and the Court denied that motion, Dkt. 47.

Jackson appealed. Dkt. 48. This Court denied Jackson's Motion to Appoint Counsel for Appeal, Dkt. 54, but the Ninth Circuit subsequently ordered appointment of counsel, Dkt. 55, and counsel was appointed, Dkt. 56. The Ninth Circuit affirmed this Court's denial of Jackson's Motion to Vacate premised on the Government's alleged violation of the plea agreement, but it concluded that this Court erred in failing to consider Jackson's "Evidence in Support," Dkt. 38, as a motion to amend his petition to add an ineffective assistance of counsel claim. Dkt. 57. It remanded for the Court to consider that claim. *Id.*

On remand, Jackson filed a supplemental memorandum asserting that the Court should grant Jackson's request to amend his petition to add an ineffective assistance of counsel claim, that the Court should hold an evidentiary hearing on Jackson's motion to vacate his sentence, and that the most appropriate remedy would be to order the Government to offer Jackson the same plea deal it gave to Young. Dkt. 70. Jackson argued that his counsel's performance was deficient because he failed to explain that the Government's promises during plea negotiations were unenforceable. *Id.* at 8.

The Government argued that Jackson's supplemental memorandum went beyond the Ninth Circuit's mandate and that his ineffective assistance of counsel claim was barred by the law of the case. Dkt. 72. It argued in the alternative that Jackson's counsel's performance was not deficient. *Id.* at 20–26. The Government also contended that, if Jackson's motion to vacate was successful, the only appropriate remedy was for Jackson to withdraw his plea and for the Court to set the case for trial. *Id.* at 26–28.

The Court concluded that Jackson's ineffective assistance of counsel claim complied with the Ninth Circuit's mandate and did not violate the law of the case. Dkt. 77. The Court reserved ruling on his motion and set it for hearing. *Id.*

C.      **Evidentiary Hearing**

The Court held an evidentiary hearing on Jackson's motion on January 31, 2023. Dkt. 89. Jackson and his former counsel, Charles Johnston, testified at the hearing. *Id.* The Government cross-examined Jackson and Johnston but did not call any witnesses. *Id.*

**1.    Charles Johnston**

Johnston testified that, in reviewing the case, he believed Jackson was less culpable than Young, who Johnston saw as the leader of the operation. Dkt. 92 at 6:19–21. He explained that, when the parties entered the courtroom on the day of the suppression hearing, plea agreements[6] had already been prepared. *Id.* at 11:12–16. The plea agreements were largely complete, except that some facts needed to be changed. *Id.*

Despite the completeness of the plea agreements and the factual edits, Jackson refused to sign the agreements because he was concerned that "Young would be treated more favorably." *Id.* at 15:10–16:2. Jackson expressed his hesitancy to Johnston within earshot of the AUSAs—"five [or] six feet, maybe [a] little farther, [or a] little less." *Id.* at 16:3–11. At that point, Johnston approached Miyake and informed him that he and Jackson were "concerned that if he pleads today, Mr. Young is going to get a better deal down the road." *Id.* at 16:12–19. Johnston's impression was that Jackson was concerned about Young receiving a better deal because he viewed Young as being much more culpable. *Id.* at 17:5–12.

In response to Johnston's questioning, Miyake replied: "Don't worry about it. It's not going to happen . . . . If anything, Mr. Young is going to get more time if anything changes, but he has the same deal your client has." *Id.* at 17:15–21. Johnston explained he had the conversation in a position such that Jackson could hear it and that he "wanted him to hear it." *Id.* at 17:22–18:1. He wanted Jackson to hear Miyake's statements

---

[6] Jackson signed two plea agreements in relation to this case because he was charged under two separate cause numbers.

because Johnston "trusted him." *Id.* at 18:13–14. Johnston then explained to Jackson: "There you go, Tony. You heard it from Mr. Miyake, and I trust him." *Id.* at 18:18–19. Jackson then signed the plea agreements. *Id.* at 18:21.

The crux of Johnston's testimony is that he believed Miyake's statements had an impact on Jackson's decision to plead guilty and that "Jackson needed the assurance that Mr. Young wouldn't get a better deal than him." *Id.* at 19:23–20:4. He affirmed that Jackson otherwise "would not have pled guilty that day." *Id.* at 20:2–4.

On cross-examination, the Government inquired only into whether Johnston instructed Jackson to lie during the plea colloquy. *Id.* at 21:7–16. Johnston affirmed that he did not. *Id.*

**2.     Tony Jackson**

Jackson's account was similar to Johnston's. He explained that plea agreements were presented to him when he entered the courtroom. Dkt. 92 at 29:12–14. He and Johnston went over the forms together and made some changes, including removing the names of others from the facts. *Id.* at 29:14–15. He had not seen the plea forms prior to that day, though he had received an informal plea letter which had "similar writing." *Id.* at 29:16–22. He explained that, despite making those changes, he still had reservations about signing the agreements because he was concerned that Young would receive a better deal. *Id.* at 31:7–16. He expressed these concerns to Johnston, within earshot of the AUSAs. *Id.* at 31:17–25.

Jackson explained that, after expressing his concerns to Johnston, Woo[7] said: "Absolutely not. That's not going to happen, I promise you. He is going to get the same agreement and the same exact time, if not more." *Id.* at 32:10–12. Jackson believed her because "she's the one that makes the deals" and, in his opinion, her statement was "part of the deal." *Id.* at 32:18–23. Jackson then signed the agreements. *Id.* at 32:25.

Jackson confirmed that he would not have pled guilty on that day if Woo had not told him that Young would not get a better deal. *Id.* at 33:12–16. He also confirmed that Johnston did not have any further conversations with him about Woo's assurances. *Id.* at 33:22–34:1.

In relation to the plea colloquy, Johnston told Jackson that the judge was going to ask him some questions and that he just needed to answer "yes, yes, no, no." *Id.* at 33:6–11. Johnston told him: "Just complete the process and I will address the Court afterward." *Id.* at 33:10–11. Jackson asserted that he did not tell Judge Bryan that there were any "side agreements" because he "thought it meant like something outside the courtroom" like "a police cooperation agreement." *Id.* at 34:5–11. He did not think Woo's statements amounted to a "side agreement" and he thought the assurance was on the record and was "golden." *Id.* at 34:12–23.

---

[7] The only conflict between Johnston and Jackson's recollections is whether the assurance at issue came from Miyake or Woo. Johnston asserts Miyake made the statement whereas Jackson asserts Woo made the statement. While the discrepancy is confusing, it is not concerning and is of no consequence. The Government does not raise this as an issue, and it presented no testimony from either of the AUSAs. The conversation took place more than seven years ago and Johnston and Jackson agree on the substance of what was said. Further, Miyake's declaration, if it were considered by the Court, confirms the conversation took place, though he disagrees somewhat about the language used.

ORDER - 10

1    Jackson also discussed a declaration he wrote while he was in isolation that
2    implied Johnston had instructed him to tell Judge Bryan there were no side agreements
3    during the plea colloquy. *Id.* at 35:10–36:19. Jackson confirmed that he drafted that
4    declaration and that it was not completely accurate. *Id.*
5    On cross-examination, the Government largely focused on the conflict between
6    Jackson's declarations and his current testimony. *Id.* at 37:6–38:7. Jackson conceded that
7    his declarations were not completely truthful, and that Johnston did not instruct him to lie
8    during the plea colloquy. *Id.* He then again affirmed that he viewed the AUSAs'
9    statements before the plea colloquy as a "promise" or "assurance." *Id.* at 39:1–7.
10   After the hearing, the Court ordered the parties to file post-hearing briefing,
11   requesting that they focus mainly on potential remedies. *See* Dkt. 89; *see also* Dkt. 92 at
12   40:17–41:2.

**D.   Post-Hearing Briefing**

14   Jackson's post-hearing brief argues that his own testimony satisfies the *Strickland*
15   test. He asserts that Johnston's "testimony confirmed (1) that [he] did not inform Mr.
16   Jackson that the Government promises about Mr. Young were not binding, and (2) that
17   Mr. Jackson specifically relied on the promises when he finally signed off on the plea
18   agreement." Dkt. 93 at 2. He also relies on Johnston's testimony in which he confirmed
19   that an AUSA had made assurances in front of Jackson and that Jackson would not have
20   signed the plea agreements without those assurances. Dkt. 93 at 3–5. Johnston also
21   confirmed that he did not inform Jackson that the Government's "promise" was not
22   binding. *Id.* at 6–7. Jackson suggests the appropriate remedy would be for the Court to

order the Government to offer Jackson the opportunity to plead guilty to a lesser charge, 18 U.S.C. § 2421. Dkt. 93 at 11. Such a remedy would result in Jackson's release from custody and likely a dramatic reduction in his term of supervised release.

The Government responds that Jackson did not and cannot establish a subjective belief that the AUSAs' assurances were binding, because his testimony conflicts with his prior sworn statements. Dkt. 94 at 2–6. It focuses specifically on the fact that Jackson previously suggested in two sworn declarations that Johnston instructed him to tell the judge there were no other agreements, but then stated during the § 2255 hearing that Johnston never instructed him to lie. *Id.* at 4–5. It argues that, for this same reason, Jackson cannot establish prejudice. *Id.* at 6–7. The Government asserts that Jackson is therefore not entitled to any remedy, but that if the Court disagrees, it should give the parties two weeks to confer regarding resolution. *Id.* at 7.

Jackson replies that, while the Government tries to rebut Jackson's own statements, it does not dispute that Johnston "believed that the Government gave Mr. Jackson an 'assurance.'" Dkt. 95 at 3. He also points out that the Government failed to address Johnston's testimony that he misled Jackson by stating: "There you go, Tony. You heard it from Mr. Miyake, and I trust him." *Id.* at 4 (quoting Transcript at 18). He concludes by summarizing his theory of the case: "Mr. Johnston's testimony shows a reasonable probability that Mr. Jackson would not have pled guilty on November 20, 2015, if Mr. Johnston had told him not to trust or rely on what the prosecutors were saying about Mr. Young." *Id.* at 6. Finally, Jackson does not object to the Government's proposal of the parties conferring on remedy. *Id.*

## II. DISCUSSION

**A. Legal Standard**

Under § 2255, the Court may grant relief to a federal prisoner who challenges the imposition or length of his incarceration on the ground that: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the Court was without jurisdiction to impose such sentence; (3) the sentence was in excess of the maximum authorized by law; or (4) the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255(a).

An inmate filing a claim for federal habeas relief is entitled to an evidentiary hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." *Id.* § 2255(b). The Ninth Circuit has characterized this standard as requiring an evidentiary hearing when "the movant has made specific factual allegations that, if true, state a claim on which relief could be granted." *United States v. Leonti*, 326 F.3d 1111, 1116 (9th Cir. 2003) (citing *United States v. Schaflander*, 743 F.2d 714, 717 (9th Cir. 1984)).

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The Court evaluates ineffective assistance of counsel claims under the two-prong test set forth in *Strickland.* To prevail under *Strickland*, a defendant must prove (1) that his counsel's performance was deficient, and (2) that this deficient performance was prejudicial. *Id.* The Court must apply a "strong presumption that counsel's conduct falls within the wide

range of reasonable professional assistance." *Id.* at 689. The attorney's performance is evaluated from counsel's perspective at the time. *Id.*

The Supreme Court has confirmed that the *Strickland* test governs challenges to guilty pleas based on the ineffective assistance of counsel. *Hill v. Lockhart*, 474 U.S. 52, 58–59 (1985). A defendant who pleads guilty upon the advice of counsel may attack the voluntary nature of the guilty plea only by showing that the advice he received from counsel to enter the plea was ineffective. *Id.* at 56–57 (citing *Tollet v. Henderson*, 411 U.S. 258, 267 (1973)). An attorney's advice to enter a plea is ineffective if it falls below "'the range of competence demanded of attorneys in criminal cases.'" *Id.* at 56 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)). With respect to *Strickland*'s prejudice requirement, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* at 59 (footnote omitted). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

A defendant has the right to effective assistance of counsel during plea bargain negotiations. *Missouri v. Frye*, 566 U.S. 134, 144–45 (2012) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010)). Counsel who misadvises a defendant about the law or who improperly coerces a defendant to accept a plea bargain may be found deficient. *See Lafler v. Cooper*, 566 U.S. 156, 168 (2012) ("If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it.").

B.  **Strickland** Analysis

   1. **Deficient Performance**

The Court concludes that Johnston's performance was deficient because he did not inform Jackson that the AUSAs' assurances were not binding.

Johnston believed that Jackson would not plead guilty absent an assurance that Young would not receive a better deal than him. Dkt. 92 at 19:23–20:4. And while Johnston trusted Miyake, as an experienced criminal defense attorney, he must have known that anything Miyake represented to him and Jackson outside of the plea agreements would not be binding on the Government. Thus, evaluating the situation from Johnston's perspective at the time, Johnston should have informed Jackson that the AUSAs' assurances were not binding.

The Government's main argument is that Jackson's testimony is not credible because it conflicts with his statements during the plea colloquy and in his signed declarations. Dkt. 94 at 2–6. It points to Jacksons' declarations in which he implied Johnston instructed him to tell Judge Bryan that there were no "side agreements." *Id.* at 4.

The Court finds this argument unpersuasive. Jackson conceded that his declarations were not completely accurate. Dkt. 92 at 35:10–36:19. While this fact does call into question Jackson's credibility, his current testimony aligns generally well with Johnston's—a witness whose credibility the Government does not challenge.

Further, it is true that Jackson's current testimony is not necessarily consistent with his statements during his plea colloquy. During his colloquy, Jackson agreed with Judge Bryan that he had not entered into any side agreements with the AUSAs. Jackson

reasonably explained this discrepancy: he believed the agreement was done in "open court." *Id.* at 34:5–23. In other words, he did not see the AUSAs' assurances as a "side agreement" but rather a promise that was part of his plea. The assurances were made in the courtroom by federal prosecutors while the parties were in the process of negotiating the plea agreements and Johnston assured Jackson that he trusted Miyake. Jackson's interpretation was reasonable, and the circumstances further support the idea that Johnston should have explained the non-binding nature of the AUSAs' statements.

Jackson proved, through both Johnston's testimony and his own testimony, that he would not have pleaded guilty absent the AUSAs' assurances. Their testimony is consistent, credible, and unrebutted by the Government. Johnston's performance was deficient in failing to inform Jackson that the AUSAs' assurances were not binding.

**2.      Prejudice**

The Court also concludes that Jackson was prejudiced by Johnston's deficient performance.

Jackson abandoned his suppression motion, pled to a higher charge than Young, agreed to a much higher custodial and supervised release term than Young, and has already served significantly more prison time than Young did.

**C.      Remedy**

Jackson argues that the Court has wide discretion in determining a remedy when granting a § 2255 motion and that "remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." Dkt. 93 at 9 (quoting *Loher v. Thomas*, 825 F.3d 1103, 1122 (9th Cir. 2016)).

He asserts that the Court has the power to simply reduce his sentence or to order the Government to offer him the choice of pleading guilty to a lesser charge. *Id.* at 8–9. He argues that the most appropriate remedy would be to vacate the judgment and order the Government to offer him the opportunity to plead guilty to the same offense as Young, which is enumerated in 18 U.S.C. § 2421.[8] *Id.* at 10. Such a remedy would likely result in Jackson being released from prison, pleading guilty to a Class C (rather than a Class A) felony, and possibly receiving a shortened term of supervised release. *Id.* Jackson also points out that the Court could grant him credit toward his term of supervised release for excessive time spent in prison. *Id.*

The Government responds that Jackson is not entitled to any remedy but that, in the event the Court grants his motion, it requests that the Court give the parties two weeks to confer regarding a resolution before ordering a specific remedy. Dkt. 94 at 7. Jackson replies that he does not oppose the Government's suggested process. Dkt. 95 at 6.

The Court agrees that allowing the parties to reach a resolution is in the interests of justice and efficiency in this case. Thus, the Court RESERVES RULING on remedy

---

[8] 18 U.S.C. § 2421 criminalizes interstate transportation for the purpose of prostitution. The maximum prison term for this crime is ten years (120 months), and the maximum term of supervised release is life. 18 U.S.C. § 2421; 18 U.S.C. § 3583(k). Young pled guilty to one count of Interstate Transportation for the Purpose of Prostitution, in violation of 18 U.S.C. § 2421, and one count of Conspiracy to Defraud the Government with Respect to Claims, in violation of 18 U.S.C. § 286. *United States v. Young*, No. 14-cr-5242 RJB, Dkt. 352; *United States v. Kirby*, No. 14-5548 RJB, Dkt. 195. Judge Bryan sentenced Young to 90 months imprisonment followed by a three-year term of supervised release. *Young*, No. 14-5242 RJB, Dkt. 381. Young was released from prison on April 15, 2021. *Id.*, Dkt. 482 at 2.

and grants the parties two weeks to confer. The parties shall file a joint status report regarding remedy on or before Friday, March 17, 2023.

### III.  ORDER

Therefore, it is hereby **ORDERED** that Petitioner Tony J. Jackson's Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255, Dkt. 1, is **GRANTED**. The Court **RESERVES RULING** on remedy. The parties shall confer on a suitable remedy and file a **JOINT STATUS REPORT** regarding the same on or before **Friday, March 17, 2023**.

Dated this 2nd day of March, 2023.

BENJAMIN H. SETTLE
United States District Judge